# WONG·FLEMING
## ATTORNEYS AT LAW

DANIEL C. FLEMING
Member of NY, NJ, PA, MD and DC Bars

DFleming@wongfleming.com

July 25, 2014

Magistrate Judge Madeline Cox Arleo
United States District Court
District of New Jersey
Martin Luther King Courthouse
50 Walnut Street, Room 2060
Newark, NJ  07101

      Re:    *City of Sterling Heights General Employees' Retirement System v. Prudential Financial, Inc.*, No. 2:12-cv-05275-SDW-MCA (D.N.J.)

Dear Judge Arleo:

      We represent Defendants Prudential Financial, Inc. ("Prudential"), John R. Strangfeld, Richard J. Carbone, and Mark B. Grier (collectively, "Defendants").  We submit this letter in opposition to Lead Plaintiffs' Letter Brief dated July 14, 2014, which seeks an order compelling additional discovery from Defendants ("Pls' Ltr. Br.").

      By way of background, the Amended Complaint's allegations arise from Prudential's November 2011 announcement of additional reserves resulting from the company's decision to enter into a settlement with Verus Financial LLC ("Verus"), which conducted an unclaimed property audit of Prudential on behalf of dozens of states.  *See* Compl. ¶¶ 22–24.  Plaintiffs contend that Prudential had previously understated its reserves because it had allegedly "failed to use available databases" such as the Social Security Administration's Death Master File ("DMF").  *Id.* ¶ 10.  Specifically, Plaintiffs claim that by not making sufficient use of the DMF to check all of its records in order to discover whether policyholders might have died without filing a claim, Defendants committed securities fraud by misstating Prudential's financial results in 2010 and the first two quarters of 2011.  *Id.* ¶¶ 8–12.

      From the outset, Plaintiffs have sought to maximize the burden of their discovery demands.  In addition to more than thirty other wide-ranging requests, Plaintiffs concurrently asked Prudential, Verus, and various state regulators for an enormous volume of identical materials:  all documents that Prudential produced to Verus or those regulators in the course of a multi-year audit of Prudential's unclaimed property and escheatment practices.[1]  A federal court in California has already quashed a subpoena served on the California Department of Insurance for these documents (Dkt. 71-9), and this Court will soon consider Verus's motion to quash a parallel subpoena (Dkt. 71).

---

[1]    *See* Ex. 1, Requests 4, 5 (Plaintiffs' document requests to Defendants); Ex. 2, Requests 1–2 (documents requests to Verus); Exs. 3–7, Requests 1–4 (Plaintiffs' documents requests to regulators in Florida, New York, California and Pennsylvania).

821 ALEXANDER ROAD, SUITE 200  ◆  P.O. BOX 3663  ◆  PRINCETON, NJ 08543-3663
TEL: (609) 951-9520  ◆  FAX: (609) 951-0270
WWW.WONGFLEMING.COM

CALIFORNIA  ◆  DISTRICT OF COLUMBIA  ◆  FLORIDA  ◆  GEORGIA  ◆  IDAHO  ◆  INDIANA  ◆  MARYLAND
MICHIGAN  ◆  NEVADA  ◆  NEW JERSEY  ◆  NEW YORK  ◆  OREGON  ◆  PENNSYLVANIA  ◆  TEXAS  ◆  WASHINGTON
ATTORNEYS ADMITTED SOLELY IN THE JURISDICTION WHERE LISTED OFFICE IS LOCATED, UNLESS OTHERWISE NOTED



While production of documents in triplicate or duplicate serves no legitimate purpose, Plaintiffs' Letter Brief raises a more fundamental question: whether Plaintiffs have any justification for the extensive document productions they seek from Prudential. They do not. Plaintiffs cannot rely on conclusory allegations of purportedly improper conduct, which have no legal relevance to their claims, to excuse the overbroad and burdensome scope of the discovery they seek, including the compelled disclosure of the personal information of millions of individuals. *See Apollo v. Pennsylvania Convention Center Authority*, No. 11-6684, 2013 WL 6795978, at *3 (E.D. Pa., Dec. 23, 2013). The Court should not countenance Plaintiffs' improper effort to expand this litigation beyond the issues that have a basis in law, and outside the relevant time periods presented in this action.

Notwithstanding pages of complaints regarding Defendants' discovery to date, Plaintiffs seek only four items of relief. (Pls' Ltr. Br at 7–8). Defendants address each in turn.

### I. Plaintiffs' Demand For Individual Policyholder Data Seeks Personal Client-Specific Information Irrelevant to Plaintiffs' Claims.

The Court should reject Plaintiffs' demand for compelled disclosure of the personal identifying information of millions of Prudential policyholders and clients. *See* Pls' Ltr. Br. at 7 (requesting order directing Defendants to produce "all unredacted documents Prudential provided and/or received" in the context of the state investigations).

As the parties seeking discovery, Plaintiffs have "the burden of showing that the information sought is relevant to the subject matter of the action and may lead to admissible evidence." *Barton v. RCI, LLC*, 2013 WL 1338235, at *3 (D.N.J. 2013); *see also Schmulovich v. 1161 RT LLC*, 2008 WL 4572537, at *5 (D.N.J. 2008) ("Notwithstanding the broad scope of discovery, information must be relevant before the Court will require its production."). Moreover, all discovery under the Federal Rules is subject to the Court's authority to limit the extent and scope of discovery where "the burden or expense of the proposed discovery outweighs its likely benefit," or as necessary to "protect a party or person from annoyance, embarrassment, oppression, or undue burden, or expense." Fed. R. Civ. P. 26(b)(2)(C)(iii), 26(c); *see Schmulovich*, 2008 WL 4572537, at *4; *NE Techs., Inc. v. Evolving Sys., Inc.*, 2008 WL 4277668, at *4–5. In this case, Plaintiffs have failed to demonstrate the relevance of the personal identifying information they seek, and can offer no valid justification for the burden, annoyance, and incursions into the privacy of individual non-parties that would result from granting their request.

Contrary to Plaintiffs' allegations of "stonewalling" (Pls' Ltr. Br. at 2), Defendants have already produced over 330,000 pages of documents and are continuing to produce large numbers of documents on a rolling basis. In response to Plaintiffs' request for the production of information previously disclosed to Verus and state authorities, Defendants have produced hundreds of thousands of pages of spreadsheets that include the following information:

- summary pages setting forth (*i*) the number of policyholder records Prudential checked against the DMF to identify potential matches; (*ii*) the number of initial matches; (*iii*) the number of matches in process; and (*iv*) the number of matches to be investigated;

- the total number of insureds or beneficiaries whose information appears in the

2



- spreadsheets;

- whether the insured is deceased, and if so, the date of death of each insured and the date the death claim was made; and

- the claim amount paid.

To protect the personal privacy of Prudential's policyholders and clients, Defendants redacted information that would identify specific individuals—such as names, social security numbers, taxpayer identification numbers, addresses, and dates of birth—before producing these spreadsheets. *See* Ex. 8 (sample extract from redacted spreadsheet). The amount of personal data included in the materials disclosed in the state regulatory inquiries is staggering: the records produced to Verus alone, not to mention separate productions to state authorities, included identifying information for at least *15 million individuals* with Prudential policies, contracts, or accounts. *See* Dkt. 70, Verus Opp. to Motion to Compel, at 17. Plaintiffs have no reasonable basis to seek the disclosure of this vast amount of personal private information.

*First*, the information is irrelevant as a matter of law and would shed no light on the reserves Prudential took which gave rise to Plaintiffs' claims.

- Under settled insurance law in all 50 states, a life insurer has no obligation to pay benefits on a policy unless and until a beneficiary provides notice and due proof of death, typically in the form of a death certificate. *See, e.g.*, Daniel W. Gerber et al., *Life Insurance Claims Adjusting and Fraud*, *in* 8 New Appleman on Insurance Law Library Edition § 86, §§ 86.01–86.02 (LexisNexis 2013); *O'Reilly v. Guardian Mut. Life Ins. Co.*, 60 N.Y. 169, 172 (N.Y. 1875) ("notice and proof of death required as conditions precedent"); W. Va. Code § 33-13-14 (insurance policies must include provision that payment of a policy "shall be made upon receipt of due proof of death"). As confirmed by the Florida Office of Insurance Regulation Rule 30(b)(6) witness, notice and proof of death are conditions precedent to an insurer's obligation to pay under a life insurance policy that allow the insurance company to determine eligibility for payment. Ex. 9, Pafford Tr. 246:21–247:6.

- Life insurers thus had no obligation proactively to search the DMF to attempt to identify potentially deceased insureds. Every court that has considered this question, including in cases involving Prudential, has reached this conclusion. *See, e.g.*, *Andrews v. Nationwide Mut. Ins. Co.*, No. 97891, 2012 WL 5289946, at *4–5 (Ohio Ct. App. Oct. 25, 2012) (because all policies are payable "upon receipt of due proof of death," requiring an insurer "to solicit or gather information pertaining to an insured's death would be contrary" to required terms of insurance policies); *Feingold v. John Hancock Life Ins. Co. (USA)*, No. 13-10185-JLT, 2013 WL 4495126, at *2 (D. Mass. Aug. 19, 2013) (life insurer's practice requiring "beneficiary to submit proof of death comports with both Massachusetts and Illinois law"), *aff'd*, 735 F.3d 55 (1st Cir. May 27, 2014); *Total Asset Recovery Servs. v. MetLife, Inc.,* No. 2010-CA-3719, Slip Op., at 4 (2d Jud. Cir. Fla. Aug. 20, 2013) (Florida law did not require Prudential to consult the DMF or "to engage in elaborate data mining of external databases"); *Perdue v. Nationwide Life Ins. Co.*, Case No. 12-C-287 at *9 (W. Va. Cty. 2013) (West Virginia law does not impose any duty on insurers to search the DMF). Only *after* the end of the Class Period have fourteen states



enacted laws that for the first time imposed such a requirement.[2]

In short, whether Prudential could have used the DMF to identify potentially deceased insureds is irrelevant to the existence of any liability under its policies.  Despite Plaintiffs' inflammatory rhetoric, *no law* required insurers like Prudential to either search the DMF or to pay beneficiaries based only on "notice" of an insured's death.  Absent this critical legal predicate, plaintiffs have absolutely no basis to seek client-specific data.  Plaintiffs' conclusory assertion that "benefits and liabilities were readily apparent from the SSA-DMF" (Pls. Ltr. Br. 2) is completely at odds with settled law, and Plaintiffs' allegation that Prudential "knew or disregarded that death benefits were owed . . . because many policyholders were listed as deceased" in the DMF (*Id*. at 1) is a *non sequitur* as a matter of law.

Indeed, the reserves that Prudential took in November 2011 did not result from the application of established law.  Rather, as described in Prudential's disclosures, the adjustments to existing reserves were the result of *new* procedures agreed to by Prudential in a settlement resolving its multi-state unclaimed property audit.  *See* Compl. ¶¶ 24, 97 (quoting Prudential's disclosures).  Among other things, for the period between 1992 and 2010, that settlement dispensed with any requirement for a death certificate and for the first time used a matching methodology that included the use of "Fuzzy Match Criteria" for comparing an insured's files to the DMF.  Applying the Fuzzy Match Criteria in a DMF search yields potential, unverified matches not only for individuals who have the same name, date of birth, or social security number as a Prudential insured, but also in instances where there may be a number of differences between the information in Prudential's records and the DMF. Ex. 10, Global Resolution Agreement, at Sch. B-1–B-4.[3]  Even today, in the fourteen states that now require use of the DMF, no law requires use of "Fuzzy Match Criteria."  *See supra* note 2, at 4.

*Second*, Plaintiffs' attempt to justify their demand cannot withstand scrutiny.  Plaintiffs claim that they need individualized records so that they can compare the information to the DMF and, where they find a match, attempt to reach the beneficiaries of deceased insureds.  *See* Pls' Ltr. Br. at 3 (contending that "Defendants are preventing Plaintiffs from obtaining information from potential beneficiaries who may provide facts concerning the steps they took to recover

---

[2]  *E.g.*, Ala. Code § 27-15-53 (passed May 15, 2012); Georgia Code. Ann. § 33-25-14 (passed April 15, 2014); Ind. Code § 27-2-23 (2014) (passed March 25, 2014); Iowa Code § 507B.4C (passed May 30, 2014); Ky. Rev. Stat. Ann. § 304.15-420 (passed Apr. 13, 2012); Md. Code Ann., Ins. § 16-118 (passed May 2, 2012); Miss. Code Ann. § 89-12-37 (passed Mar. 24, 2014); 2013 Mont. Laws Ch. 119 (passed Mar. 29, 2013); Nev. R.S. § 688D.090 (passed June 10, 2013); 2013 N.M. Stat. Ann. § 59A-16-7.1 (passed Apr. 1, 2013); N.Y. Comp. Codes R. & Regs. tit. 11, §§ 226.0–226.6 (filed June 14, 2012 as an emergency measure); N.Y. Ins. Law § 3240(f) (passed Dec. 17, 2012); 2013 N.D. Cent. Code § 26.1-55-02 (passed Apr. 26, 2013); Tenn. Code § 56-7-32 et. seq. (passed May 19, 2014); 27 Vt. Stat. Ann. § 1244a(b) (passed May 21, 2013).

[3]  For example, applying Fuzzy Match Criteria, the following would be considered potential matches: (*i*) names with different spellings or nicknames, (*ii*) dates where the month and day are transposed, or with different years of birth, and (*iii*) Social Security Numbers where two of the digits were different.  *Id.* at Sch. B-2–B-4.  Under these criteria, a Prudential record of an insured named Harriet with a birthdate of May 11, 1935 and Social Security Number 123456789 would be a potential match to entries in the DMF for an individual named Harrietta born on November 5, 1935 with Social Security Number 123466781, and a Harrieta born on May 11, 1953 with Social Security Number 173426789.  *See id.*



benefits"). Putting aside the inherent inappropriateness of such an invasion of privacy of the beneficiaries of a deceased insured, this is a civil securities case, not a regulatory investigation, and nothing in the Federal Rules permits Plaintiffs to demand the personal identifying data of millions of individuals who are not parties to this action, in an attempt to replicate the DMF-matching work already conducted by state regulatory authorities, on a quest to obtain information that has no relevance to their claims.

In any event, there is no point in having Plaintiffs sort through Prudential's records for 15 million or more individuals to search for potential deaths that might have gone unreported. As Verus has explained to this Court, it used a proprietary patent-protected method for reviewing all of Prudential's records to determine potential deaths using the Fuzzy Match Criteria, so Plaintiffs could not hope to replicate the work even if they wished to engage in this pointless exercise. *See* Dkt. 71-1, Verus Motion to Quash, at 2, 3, 11–12. Rather, the only data that conceivably bear on Plaintiffs' claims are the *results* of the audit, which will show the total amounts Prudential eventually paid as a result of the regulatory settlement, although even those results were unknown when Prudential announced the settlement in November 2011.[4] That information will be reflected in the documents Defendants are producing to Plaintiffs.

*Third*, contrary to Plaintiffs' arguments, federal courts have recognized that litigants may redact documents produced in discovery to protect the personal identifying information and privacy interests of individuals even where a confidentiality order or agreement is in place. *See, e.g.*, *Her v. Regions Fin. Corp.*, No. 2:07-CV-2017-RTD, 2007 WL 2806558, at *2 (W.D. Ark. Sept. 25, 2007) (permitting defendants to redact "social security numbers, dates of birth, and drivers' license numbers" prior to production, notwithstanding confidentiality agreement, noting that "release of this information could prove harmful to the borrowers and is not vital to the Plaintiffs' case"); *see also Hu v. Cantwell*, No. 06-C-6589, 2008 WL 4889015 at *3 (N.D. Ill. 2008) (permitting defendants to redact the name "and any other personal information" of third-party purchaser of property "that may not be pertinent" to plaintiff's claim).

The cases Plaintiffs cite in support of their request do not justify the extensive compelled disclosure they seek. Unlike Prudential, the producing plaintiff in *HR Tech, Inc. v. Imura Int'l U.S.A., Inc.* did not claim that its redactions were necessary to preserve the privacy of non-parties; rather, it argued only that it was "entitled to make such redactions from documents" to remove information that was not "discoverable." No. 08-2220-JWL, 2010 U.S. Dist. LEXIS 121921, at *16–17 (D. Kan. Nov. 17, 2010) (cited in Pls' Ltr. Br. at 3). Likewise, in stark contrast to the circumstances here, *Green v. Monarch Recovery Management, Inc.* involved the redaction of personal information for only 2,400 individuals, and the defendants had conceded that at least a small number of the individuals were "likely relevant to the matter before the Court." No. 1:13-cv-00418-SEB-MJD, 2014 U.S. Dist. LEXIS 57104, at *7 (S.D. Ind. 2014) (cited in Pls' Ltr. Br. at 3). In this case, however, Plaintiffs' Letter Brief confirms that they seek

---

[4] For these reasons, Defendants have objected to Plaintiffs' request for "[a]ll documents and communications relating to *any instance* in which payments were made to beneficiaries after, or as a result of, identifying deceased policyholders in the SSA-DMF." *See* Ex. 11, at 16–17 (Defendants' Amended Responses & Objections) (emphasis added). Plaintiffs have identified no valid reason for their demand for individualized records, rather than the aggregate data that will already be included in the documents Defendants have agreed to produce.



the personal information of millions of individuals just to conduct fishing expeditions that will harass and invade the privacy of an undetermined number of surviving beneficiaries.  The Court should not countenance such speculative and abusive discovery tactics.

*Finally*, Plaintiffs are not entitled to obtain the "underlying native Excel files" used to generate the redacted spreadsheets.  Pls' Ltr. Br. at 7.  It is standard discovery practice to produce redacted documents in PDF or image format to ensure the integrity of the redactions.  To the extent Plaintiffs want to make allegations based on the number or dollar amount of matches, the redacted revisions allow them to do so.  This information is directly accessible in the format in which the documents have been disclosed, with no need to resort to the advanced "information processing features" of an Excel spreadsheet.  *Id.* at 4.

**II.       Plaintiffs' Arguments on the Scope of Defendants' Production Should Be Rejected.**

   A. <u>Plaintiffs' Time Period Is Overbroad.</u>

The Class Period in the Complaint runs only eighteen months, from May 5, 2010 to November 4, 2011.  Compl. ¶ 1.  Defendants concur that documents that pre-date and post-date the Class Period may be potentially relevant to the Parties' claims and defenses.  Where the Parties differ is how far beyond the Class Period it is permissible and appropriate for discovery to extend.  Once again, Plaintiffs have failed to establish any reasonable basis for the breadth of their request.

Plaintiffs' First Set of Document Requests sought the production of documents "created, dated, prepared, drafted, generated, modified, sent, provided, obtained, used, or received during the Relevant Time Period," defined as "January 1, 2008 through December 31, 2012."  Ex. 1, at 15.  But in fact, Plaintiffs' "Relevant Time Period" imposed no effective limitation at all on the scope of their document requests:  in the same instruction, Plaintiffs also sought "all responsive documents created *before or after* the Relevant Time Period, or the time period otherwise specified by the request, that *relate in whole or in part, to facts, transactions, events, or occurrence[s] taking place, or anticipated to take place*, during the Relevant Time Period." *Id.* at 16 (emphases added).  In other words, regardless of when they were created, Plaintiffs demanded production of any responsive documents that "relate[d]" to anything that occurred or was expected to occur at any time during the five-year period they identified.

Defendants objected.  For most of Plaintiffs' requests, Defendants stated that they would "not produce documents dated, prepared, generated, created, edited, revised or received before January 1, 2009 or after January 31, 2012."  Ex. 11, at 7.  Following the meet-and-confer, Defendants amended their Responses and Objections to agree to a December 31, 2012 cutoff date for all of Plaintiffs' requests that sought documents concerning reserves (Request 12, 17–20), accounting and financial reporting of unclaimed property (Request No. 21), and minutes of Board meetings discussing State Investigations, the increase in reserves based on the GRA, and the DMF (Request No. 22).  As a result, the time period applied by Defendants comfortably includes the Class Period and the facts, transactions, events, and occurrences relevant to Plaintiffs' securities claims, including the regulatory investigations; the February, May, August, and November 2011 disclosures cited in the Amended Complaint; the conclusion of the regulatory settlement agreements; and the establishment of the reserves giving rise to Plaintiffs'

6



allegations.

Plaintiffs do not contest the January 1, 2009 start date for the time period applied to Defendants' productions; instead, they seek the disclosure of additional "post-class period documents," namely a series of Unclaimed Property Reports ("UPRs") generated after January 31, 2012 pursuant to the Global Resolution Agreement. Pls' Ltr. Br. at 4. Plaintiffs have failed to establish the relevance of these documents. UPRs generated in and after 2012 can by definition have had no effect on the disclosures made or additional reserves taken in November 2011 that underlie the claims in the Amended Complaint. Plaintiffs cannot "roam in shadow zones of relevancy and [seek] to explore matter which does not appear germane merely on the theory that it might become so." *Claude P. Baumberger Int'l, Inc. v. Rohm and Haas Co.*, CIV. No. 96–1041(WGB), 1998 WL 684263, at *2 (D.N.J. April 1, 1998).

> B. <u>Plaintiffs' Allegations that Defendants Have Simply Refused to Produce Certain Documents Are Unfounded.</u>

Without reference to either their own document requests or Defendants' responses and objections, Plaintiffs assert that Defendants "refuse to produce documents Prudential has already provided and/or received in the state investigations regarding its unclaimed property practices," and "are withholding information related to the impact of Prudential's unclaimed property practices on its financial statements." Pls' Ltr Br. at 5.

As the discovery requests and responses show, however, these contentions purposely misstate Defendants' position and ignore the course of discovery to date.

Plaintiffs' Document Request No. 5 sought "[a]ll documents and communications relating to the State Investigations or any other review, audit or examination regarding Prudential's claims payment, or escheatment of unclaimed property, including but not limited to the Company's use or non-use of the DMF." Ex. 1, at 17. In response to this Request, Defendants stated that they "*will produce* relevant, non-Privileged documents concerning the State Investigations," subject to and without waiving Defendants' general and specific objections. Ex. 11, at 12 (Defendants' Amended Responses & Objections) (emphasis added). As noted above, hundreds of thousands of pages of materials responsive to this Request have already been produced, and further productions are occurring on a rolling basis. *See supra*, p. 2.

Similarly, Plaintiffs' Document Request No. 6 sought "[a]ll documents and communications relating to any estimated, actual or potential charge, revision, adjustment, impact or other effect related to Prudential's unclaimed property or escheatment practices on any Prudential financial statement, including but not limited to use or non-use of the DMF." Ex. 1, at 17. Once again, in response to this Request, Defendants stated that they "*will produce* relevant, non-Privileged Documents responsive to the Request, if any." Ex. 11, at 13 (emphasis added).

**III. Prudential's 30(b)(6) Witnesses Were Adequately Prepared.**

Plaintiffs contend that the witnesses designated to testify on behalf of Prudential under Rule 30(b)(6) were "unprepared to testify on the noticed topics," but have conspicuously failed even to quote any part of the deposition notice or relevant excerpts of the transcripts of the



depositions. Pls' Ltr. Br. at 6–7. As demonstrated by these documents, which are included as exhibits to this letter, Plaintiffs' arguments are unfounded and ignore both the plain text of their deposition notice and the clear testimony of Defendants' witnesses.

*First*, Plaintiffs assert that Eileen Geary, who testified on behalf of Prudential for Topic 2, "admitted she was not prepared to testify on that topic." Pls' Ltr. Br. at 7. The transcript of Ms. Geary's deposition refutes this characterization. Topic 2 sought 30(b)(6) testimony on "Prudential's processes and procedures for risk management related to unclaimed property and insurance rules and regulations including the board's review of and response to the state investigations." Ex. 12, at 9 (30(b)(6) Deposition Notice). After some initial confusion caused by the fact that Ms. Geary had not understood counsel's questions, she clarified her earlier statements and confirmed that she was prepared to testify on (*i*) "policies and procedures for risk management related to unclaimed property"; (*ii*) "the risk management process that we have at Prudential" for "insurance rules and regulations as it applies to unclaimed property"; and (*iii*) the "status updates given to the board during . . . 2011 regarding the activities with the state investigations." Ex. 13, Geary Tr. 52:4–58:14.

*Second*, Plaintiffs argue that Elaine Green, who testified on behalf of Prudential for Topics 3 and 4 "could not testify as to how the SSA-DMF was used or how such procedures for its use figured into the reserve calculations." Once again, however, the deposition transcript shows that Ms. Green could and did explain how use of the DMF affected the establishment and adjustment of reserves. *See, e.g.*, Ex. 14, Green Tr. 83:6–85:4, 83:6–85:4, 101:11–103:15. More generally, she provided extensive testimony on the topics as they had in fact been identified in the deposition notice, namely "[t]he impact of Prudential's unclaimed property and escheatment practices or procedures on the Company's financial statements, including earnings per share results, the pricing of life insurance or annuity products, and interest earned or revenue generated therefrom," Ex. 12, at 9 (Topic 3); *see* Ex. 14, Green Tr. 122:21–123:7; 155:9–156:17; and "Prudential's practices or procedures for estimating and setting reserves affected by unreported death claims, the use of the SSA-DMF, and payment or escheatment of unclaimed property." Ex. 12, at 10 (Topic 4); *see* Ex. 14, Green Tr. 58:20–63:13, 139:1–142:3.

In a number of instances throughout the four-hour deposition, Plaintiffs' counsel asked questions that went beyond the generality of the noticed topics, and required detailed actuarial knowledge. In response, Ms. Green explained that Prudential's actuaries were best placed to answer such questions. *See, e.g.*, Ex. 14, Green Tr. 21:8–22:3; 39:5–42:2; 51:9-25; 143:17–144:11. Such explanations frequently occur in 30(b)(6) depositions, and neither indicate that the witness was inadequately prepared nor entitle Plaintiffs to further 30(b)(6) depositions. *Costa v. County of Burlington*, 254 F.R.D. 187, 190 (D.N.J. 2008) ("Simply because the witness could not answer every question posed to him does not equate to the fact that defendant did not satisfy its obligation to prepare its 30(b)(6) witness."); *Alexander v. FBI*, 186 F.R.D. 137, 140, 142–43 (D.D.C. 1998) (mere fact that deponent did not have knowledge "in certain narrow respects" does not render her inadequate or entitle the noticing party to "several new depositions"; "Rule 30(b)(6) puts several duties on the designating party and on the deponent, but one of them is not omniscience.").

*Finally*, Plaintiffs argue that Michael Perelman, who testified for Prudential on Topic 5, "was not prepared to testify on the steps Prudential had taken to collect or locate relevant

8



information" sought in discovery in this case, "took no steps to obtain an understanding of what information, if any, was provided to the state regulators or Verus," and could not "testify about Prudential's use of the SSA-DMF or software used to cross-check or obtain policyholder information." Pls' Ltr. Br. at 7. The reason for this is simple. *None* of these issues appear *anywhere* in Topic 5 in Plaintiffs' deposition notice, which sought testimony on the following general matters:

> (a) The identity and description of all computers and servers where electronic, data, e-mail or documents are stored or backed up; (b) the identity and description of electronic devices used by Prudential's officers, directors, vice presidents and controllers; (c) The identity and description of software systems used for the creation, storage, backup and production of electronic data, e-mail, or documents; (d) A description of backup procedures and policies actually followed for the electronic data, e-mail or documents and (e) the identity and description of the operating systems and backup.

Ex. 12, at 10. In short, Topic 5 included no reference whatsoever to the regulatory investigations, Prudential's use of the SSA-DMF, or the specific discovery sought in this case. Plaintiffs cannot complain of a witness's preparation on topics that were never noticed in the first place.

## IV. Other Issues

The Letter Brief also confirms that Plaintiffs have little interest in using the meet-and-confer process, as required by the local rules, to narrow or resolve differences between the Parties and avoid burdening the Court with unnecessary disputes. Two of Plaintiffs' four requests for relief need not have been raised with the Court at all: during the July 2 meet and confer, Plaintiffs asked Defendants to provide a list of custodians to be searched and Defendants confirmed that they would do so in August. *See* Pls' Ltr. Br., at 7 (request (c)). Similarly, had Plaintiffs asked Defendants to provide a log of documents withheld from the PricewaterhouseCoopers production (*id.* request (d)), Defendants would have readily agreed—as one was already being prepared. In fact, in response to correspondence Plaintiffs sent *after* submitting the Letter Brief, Defendants confirmed that they will provide such a log. Defendants hereby confirm, once again, that they will provide the list of custodians sought by Lead Plaintiffs by August 31. As a result, Plaintiffs' requests for relief (c) and (d) are moot, and need take no more of the Court's time.

*Remainder of Page Left Intentionally Blank*

## V. Conclusion

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' requests for relief.

Respectfully submitted,

| | |
|---|---|
| *Edwin G Schallert /MR* | /s/ Daniel C. Fleming |
| Edwin G. Schallert | Daniel C. Fleming |
| Debevoise & Plimpton LLP | Wong Fleming |
| 919 Third Avenue | 821 Alexander Road, Suite 200 |
| New York, NY  10022 | Princeton, NY  08540 |

*Attorneys for Defendants Prudential Financial, Inc.,*
*John R. Strangfeld, Richard J. Carbone, and Mark B. Grier*