<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CITY OF STERLING HEIGHTS GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,**<br>*Plaintiffs,*<br><br>v.<br><br>**PRUDENTIAL FINANCIAL, INC., et al.,**<br><br>*Defendants.* | **Civil Action No. 12-5275**<br><br>**OPINION**<br><br>**August 31, 2015** |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Before this Court are the following motions: (1) The motion of Lead Plaintiffs National Shopmen Pension Fund ("National Shopmen"), Heavy & General Laborers' Locals 472 & 172 Pension and Annuity Funds, and Roofers Local No. 149 Pension Fund (collectively, "Lead Plaintiffs") to certify a class, appoint National Shopmen as class representative, and appoint class counsel pursuant to Federal Rule of Civil Procedure 23 [Dkt. No. 133]; and (2) the motion of Defendants Prudential Financial, Inc. ("Prudential"), John R. Strangfeld, Richard J. Carbone, and Mark B. Grier (collectively, "Defendants") to exclude the expert testimony of Lead Plaintiffs' expert [Dkt. No. 185]. No oral argument was heard pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. In consideration of the parties' submissions in connection with these motions, and for the reasons set forth herein, Lead Plaintiffs' motion is **GRANTED** and Prudential's motion is **DENIED**.

I.      **BACKGROUND AND PROCEDURAL HISTORY**

This case is a putative securities class action in which Lead Plaintiffs allege that Prudential violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") between May 5, 2010, and November 4, 2011 (the "Class Period"), by making false and misleading statements that overstated Prudential's income and understated its expenses. See generally Dkt. No. 22, Am. Compl. Prudential is a public corporation headquartered in New Jersey. Id. ¶ 2. Its common stock trades on the New York Stock Exchange ("NYSE"). Id. Defendants Strangfeld, Carbone, and Grier are current and former high-level executives of Prudential against whom Lead Plaintiffs allege direct liability under § 10(b) and control person liability under § 20(a).[1] Id. ¶¶ 3-4, 32-44. Lead Plaintiffs are purchasers of Prudential's common stock during the Class Period. Id. ¶ 29.

Prudential is principally engaged in the business of "life insurance, annuities and retirement-related services." Id. ¶ 5.[2] Lead Plaintiffs claim that Prudential knowingly or recklessly failed to account for life insurance policies that were eligible for payment to a beneficiary or escheatment to a state, which falsely inflated Prudential's reported financial results during the Class Period. Id. ¶¶ 11-12, 54, 57. At the heart of Lead Plaintiffs' allegations are Prudential's historical use of the Social Security Administration's Death Master File (the "DMF") and various

---

[1] The Amended Complaint also originally asserted a cause of action under § 20(b), but that claim was dismissed in a February 6, 2014, order. Dkt. No. 34, Order on Mot. to Dismiss.

[2] Prudential's operations are comprised of two separate lines of business: the Financial Services Businesses—the bulk of Prudential's operations—and the Closed Block Business. See Am. Compl. ¶ 5. The Financial Services Businesses are composed of four broad divisions: (1) U.S. Retirement Solutions and Investment Management; (2) U.S. Individual Life and Group Insurance; (3) International Insurance and International Investments; and (4) Corporate and Other. Id. The Closed Block Business is essentially a legacy business composed of life insurance products that Prudential ceased to offer following Prudential's demutualization; accordingly, its assets and liabilities have been segregated from the Financial Services Businesses. Id. Prudential consistently represented during the Class Period that only the performance of the Financial Services Businesses impacted the value of Prudential's common stock. Id. ¶ 6.

states' investigations into Prudential's unclaimed property practices that began in 2009 and ended with a global settlement in January 2012.  See id. ¶¶ 8, 57(e), 101-07.  The DMF is a database maintained by the Social Security Administration that tracks deaths in the United States.  Id. ¶ 8. Lead Plaintiffs claim that for many years, Prudential regularly used the DMF to identify deceased annuity policyholders in order to stop annuity payments, but only sometimes used the DMF to identify deceased life insurance policyholders and locate their beneficiaries or, if there were no beneficiaries under a given policy, inform the relevant state authorities that the policy was eligible for escheatment.  Id. ¶¶ 9-10, 57(c).  As a result, Lead Plaintiffs allege, Prudential knowingly retained monies that did not belong to it and understated its liabilities to policyholders.  Id. ¶¶ 10-11.  Lead Plaintiffs allege that Defendants therefore materially overstated Prudential's financial strength in financial reports and other disclosures made during the Class Period.  Id. ¶¶ 12, 16, 45-56.

The Class Period begins on May 5, 2010, when Prudential issued a press release announcing its financial results for the first quarter of 2010.  Id. ¶ 45.  Prudential reiterated its first quarter results on May 7, 2010, when it filed its Form 10-Q for the first quarter of 2010.  Id. ¶ 46. Lead Plaintiffs allege that essentially all announcements of Prudential's financial results during the Class Period were materially false and misleading such that Prudential's common stock traded at inflated prices throughout the Class Period.  Id. ¶¶ 47-56, 61-63, 66-68, 71-75, 80-85.

Prudential allegedly began to disclose the truth about its unclaimed property practices and the ongoing state investigations on August 5, 2011, when it acknowledged the breadth of those investigations and confirmed that they would "result in additional payments and impact claims revenues."  Id. ¶ 86.  S&P downgraded the United States' credit rating on the same day.  Id. ¶ 87. At the close of trading on August 8, 2011—the next trading day—Prudential's per-share stock

price stood at $48.14, down from a close of $53.99 on August 5.  Id. ¶ 89.  On November 2, 2011, Prudential issued a press release announcing the company's financial results for the third quarter of 2011.  Id. ¶ 91.  In the press release, Prudential revealed that it would take a pre-tax $99 million charge (the "DMF Charge") to its reserves to account for additional payments expected to result from the use of new DMF matching criteria.  Id.  Prudential also announced several other unrelated charges in the press release, including a $435 million charge "to strengthen reserves for guaranteed death and income benefits."  Id.  Mr. Carbone reiterated the DMF Charge on a conference call the next day.  Id. ¶ 94.  Prudential again acknowledged the DMF Charge when it filed its third quarter 2011 Form 10-Q ("3Q11 Form 10-Q") on November 4, 2011.[3]  Id. ¶ 97.  Specifically, Mr. Carbone noted on the conference call that the DMF Charge resulted in a $0.15 per share impact on Prudential's stock.  Id. ¶ 94.  The 3Q11 Form 10-Q provided additional detail regarding the state investigations and the new DMF matching criteria that resulted therefrom.  Id. ¶ 98.  After closing at $53.67 per share on November 2, 2011, Prudential's stock price closed at $53.05 and $52.19 on November 3 and November 4, respectively.  Id. ¶ 99.

Plaintiff City of Sterling Heights General Employees' Retirement Systems instituted this action on August 22, 2012.  Dkt. No. 1, Compl.  Lead Plaintiffs and Lead Plaintiffs' counsel were appointed as lead plaintiffs and lead counsel on March 21, 2013.  Dkt. No. 21.  Lead Plaintiffs filed the Amended Complaint on May 6, 2013.  Dkt. No. 22, Am. Compl.  Defendants thereafter moved to dismiss the Amended Complaint, and the Honorable Susan D. Wigenton, U.S.D.J., issued an order on February 6, 2014, granting in part and denying in part Defendants' motion.  Dkt.

---

[3] Lead Plaintiffs allege that the charge was actually increased to $139 million due to a $40 million charge against the Closed Block Business.  Am. Compl. ¶ 97.  Lead Plaintiffs acknowledge, however, that Prudential consistently represented that the Closed Block Business had no impact on the value of Prudential's common stock.  Id. ¶ 6.  Given that fact, the $40 million charge to the Closed Block Business is not at issue here.

No. 34, Order on Mot. to Dismiss.  Lead Plaintiffs now move for certification of a class consisting of all purchasers of Prudential's common stock during the Class Period, with the exception of Defendants and various entities and persons connected to Defendants.  Dkt. No. 133, Mot. for Class Cert.  Defendants oppose class certification and move to exclude the report and opinions of Lead Plaintiffs' expert, Professor Steven P. Feinstein (the "Feinstein Report").  Dkt. No. 185, Mot. to Exclude Expert Report.

## II.   LEGAL STANDARD

### A.  Class Certification Requirements

Federal Rule of Civil Procedure 23 sets forth the requirements that must be fulfilled before a case may proceed as a class action.  There are four basic prerequisites for class action treatment:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These are known as the numerosity, commonality, typicality, and adequacy requirements.  See In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009).  Second, plaintiffs must also meet the requirements of one of Rule 23(b)'s provisions.  Id.  Here, Lead Plaintiffs seek certification under Rule 23(b)(3), which permits certification only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The twin requirements of Rule 23(b)(3) are known as predominance and superiority."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 310 (3d Cir. 2008).  In general, Rule 23(b)(3)'s

predominance requirement is the most crucial requirement in securities class actions.  Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II), 134 S. Ct. 2398, 2412 (2014).  This case is no different.

A plaintiff "must affirmatively demonstrate" that Rule 23's requirements are satisfied, Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011), by providing actual evidentiary proof that the requirements are met.  Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013).  Therefore, a reviewing court must conduct a "rigorous analysis" of each of Rule 23's requirements, Dukes, 131 S. Ct. at 2551, and must be satisfied that each requirement is established by a preponderance of the evidence.  In re Blood Reagents Antitrust Litig., 783 F.3d 183, 187 (3d Cir. 2015).  This analysis frequently overlaps with "the merits of the plaintiff's underlying claim." Dukes, 131 S. Ct. at 2551.  The merits may be considered, however, "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013).

**B. Admissibility of Expert Opinion**

Courts are also frequently called upon to consider expert opinion offered to support or oppose class certification.  Hydrogen Peroxide, 552 F.3d at 323.  Where an expert opinion is critical to class certification and a party challenges the reliability of that opinion, the reviewing court must engage in a two-step analysis before analyzing whether Rule 23's requirements have been met: (1) whether the party's challenges bear upon "those aspects of [the] expert testimony offered to satisfy Rule 23" and (2) if so, whether the opinion is admissible as to those aspects under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms. Inc., 509 U.S. 579 (1993). Blood Reagents, 783 F.3d at 188.

Federal Rule of Evidence 702 provides the general parameters of admissible expert testimony:

> A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In deciding whether to admit expert testimony, the trial court serves as a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999) (applying Daubert standard to all expert testimony). The Court considers whether: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is helpful to the trier of fact, i.e., it must "fit" the facts of the case. See United States v. Schiff, 602 F.3d 152, 172 (3d Cir. 2010). The proponent of the expert testimony must prove these three requirements by a preponderance of the evidence. Mahmood v. Narciso, 549 F. App'x 99, 102 (3d Cir. 2013) (citing In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999)).

In determining whether proposed expert testimony is reliable, the trial court should examine:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

7

In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994); see also Schneider, 320 F.3d at 405.  Each step of the expert's analysis must be reliable, including "the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion."  ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 291 (3d Cir. 2012).  But proponents of expert testimony need not "prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable."  Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000).

## C.  Section 10b and Rule 10b-5

Section 10b and Rule 10b-5, see 15 U.S.C. § 78j and 17 C.F.R. 240.10b-5, prohibit deception in relation to the sale of securities.  In order to recover, a plaintiff must prove the following elements: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation."  City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 167 (3d Cir. 2014).

At the class certification stage, materiality and loss causation need not be considered.  See Amgen, 133 S. Ct. at 1199 (materiality); Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I), 131 S. Ct. 2179, 2185-86 (2011) (loss causation).  Conversely, the element of reliance must be considered at class certification.  Halliburton II, 134 S. Ct. at 2407-08.

In order to establish reliance, the plaintiff may invoke the rebuttable presumption set forth in Basic, Inc. v. Levinson, 485 U.S. 224 (1988), which presumes that all investors rely on the integrity of the market price when deciding whether to buy or sell stock. Id. at 247.  The presumption is based on the "fraud-on-the-market" theory, which provides that where a company's

stock trades on an efficient market, its stock price incorporates all material public information, including misrepresentations.  See id. at 246 (internal quotations and citation omitted).  In order to invoke the <u>Basic</u> presumption of reliance, the plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."  <u>Halliburton II</u>, 134 S. Ct. at 2408.[4]

Because market efficiency is so crucial to the invocation of the <u>Basic</u> presumption, "which in turn is necessary to meet the Rule 23(b)(3) predominance requirement, a district court should conduct a rigorous market efficiency analysis."  <u>In re DVI, Inc. Sec. Litig.</u>, 639 F.3d 623, 638 (3d Cir. 2011), <u>abrogated on other grounds by</u> <u>Amgen v. Conn. Ret. Plans & Trust Funds</u>, 133 S. Ct. 1184 (2013).  The defendant may rebut the presumption by proving that the alleged misrepresentation(s) had no impact on the stock price, thereby precluding class certification under Rule 23(b)(3).  <u>Halliburton II</u>, 134 S. Ct. at 2414.

## III.  ANALYSIS

### A.  Defendants' Motion to Exclude Lead Plaintiffs' Expert Report

Here, Lead Plaintiffs use the Feinstein Report to establish market efficiency and invoke the <u>Basic</u> presumption.  Because the Feinstein Report bears directly on issues relevant to class certification, the Court first analyzes the report's admissibility to the extent it concerns matters relevant to class certification.

#### 1.  Expert Qualifications

---

[4] As mentioned above, the Supreme Court has ruled that materiality is not an inquiry for the class certification stage.  See <u>Amgen</u>, 133 S. Ct. at 1199.

Defendants do not challenge Professor Feinstein's qualifications.  His credentials and experience qualify him to offer an expert opinion in this case.  See Dkt. No. 133-7, Decl. & Report of Steven P. Feinstein ¶¶ 6-16, Exhibit 2.  Professor Feinstein holds a Ph.D. in Economics, a Master of Philosophy in Economics, a Master of Arts in Economics, all from Yale University, and a Bachelor of Arts in Economics from Pomona College.  He is a chartered financial analyst and has taught undergraduate and masters-level courses at Babson College in Valuation, Capital Markets, Quantitative Methods, and Security Valuation, among others.  Before his time at Babson College, he taught finance at Boston University and worked as an Economist for the Federal Reserve Bank of Atlanta.  He has also been published extensively in the field of finance.  The qualification requirement is construed liberally; "a broad range of knowledge, skills, and training qualify an expert."  Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  Professor Feinstein is qualified.

### 2.  Reliability

Defendants dispute the reliability of Professor Feinstein's testimony on two bases. First, they argue that Professor Feinstein's testimony fails to prove that the DMF Charge on November 2, 2011, affected the price of Prudential stock because, inter alia, there were other disclosures on the same day for which Professor Feinstein does not account.  Second, Defendants argue that Lead Plaintiffs' damages model is barebones and unimplemented, and so does not satisfy Daubert.

### a.  Market Efficiency Analysis

As an initial matter, Defendants do not challenge the reliability of the Feinstein Report's market efficiency analysis.  The Court is satisfied that Professor Feinstein's analysis on that point is reliable.

Professor Feinstein's market analysis is based on the factors set forth in <u>Cammer v. Bloom</u>, 711 F. Supp. 1264 (D.N.J. 1989); <u>Krogman v. Sterritt</u>, 202 F.R.D. 467 (N.D. Tex. 2001); and <u>Unger v. Amedisys</u>, 401 F.3d 316 (5th Cir. 2005). <u>Cammer</u> identifies five relevant factors to determine whether a company's stock trades in an efficient market: (1) the company's average weekly trading volume; (2) the number of securities analysts following and reporting on the company; (3) the number of market makers in the company's stock; (4) whether the company is eligible to file the Form S-3 Registration Statement with the SEC; and (5) whether there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price. <u>Cammer</u>, 711 F. Supp. at 1286-87. <u>Krogman</u> and <u>Unger</u> identify three additional factors that should be considered: (1) the magnitude of the company's market capitalization; (2) the size of the bid-ask spread for the company's stock, i.e., the difference between the price that potential buyers are willing to pay and the price at which potential sellers are willing to sell; and (3) the company's float, i.e., the percentage of shares that are publicly held. <u>Krogman</u>, 202 F.R.D. at 478; <u>Unger</u>, 401 F.3d at 323. The use of these factors has been cited with approval in a majority of circuits. <u>See</u> <u>In re DVI, Inc. Sec. Litig.</u>, 639 F.3d 623, 634 n.16 (3d Cir. 2011) (collecting cases).

In his report, Professor Feinstein explores these factors and concludes that Prudential's stock trades in an efficient market. <u>See</u> Feinstein Report ¶¶ 29-153. He also conducts an event study to analyze the fifth <u>Cammer</u> factor—i.e., whether there exists an empirically demonstrable causal relationship between the release of Prudential-specific information and movement in Prudential's stock price. An event study includes "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." <u>Halliburton II</u>, 134 S. Ct. at 2415. Defendants do not challenge the reliability of the event study

method, and there is no dispute that the method is widely accepted in the academic community and in the courts.  See Feinstein Report ¶¶ 91-92; see, e.g. In re DVI, Inc. Sec. Litig., No. 03-5336, 2010 WL 3522090, at *12 n.24 (E.D. Pa. Sept. 3, 2010).

The event study examines the movement of Prudential's stock price on seven dates during the Class Period immediately following earnings announcements or changes in earnings guidance. See Feinstein Report ¶¶ 99-100.  The first six dates concern earnings announcements during the Class Period that Lead Plaintiffs allege were false and misleading, while the seventh date concerns the disclosure of, inter alia, the DMF Charge.  The dates examined contained earnings announcements and changes in earnings guidance—information virtually all economists agree is important to investors.  Id. ¶¶ 96-98.  The event study then contains a detailed regression analysis that sought to isolate the impact of Prudential's earnings announcements from other potentially confounding factors.  Id. ¶¶ 102-14.  Professor Feinstein's analysis ultimately found statistically significant changes in Prudential's stock price attributable to the earnings announcements on six of the seven days examined.  Id. ¶¶ 115-22, Ex. 7.  Based on this result, Professor Feinstein concluded that Prudential's stock traded in an efficient market during the Class Period.  Id. ¶ 120. Defendants do not dispute that Prudential's stock trades on an efficient market.  The Court is therefore satisfied that Professor Feinstein's opinion concerning market efficiency is reliable.

### b.  The DMF Charge

Defendants argue that Professor Feinstein does not provide a reliable basis from which to conclude that the DMF Charge announced on November 2, 2011, caused the downward price movement the following day.  Lead Plaintiffs agree that Professor Feinstein does not offer such a conclusion at this stage because such an opinion is not required for plaintiffs to invoke the presumption of reliance at class certification.  Dkt. No. 216, Pls.' Opp. at 13.  The parties, in effect,

agree on the scope of Professor Feinstein's opinion. This dispute is therefore not a challenge to admissibility, but a question of whether the Feinstein Report provides sufficient proof to certify the class.

Professor Feinstein did not compartmentalize each disclosure made concurrently with the DMF Charge, but he did not need to do so. Such an analysis would require the expert to wade into questions of loss causation and materiality, issues that are not properly before the Court at the class certification stage. See Amgen, 133 S. Ct. at 1199 (materiality not relevant at class certification); Halliburton I, 131 S. Ct. 2184-87 (loss causation not relevant at class certification); see also Blood Reagents, 783 F.3d at 188. Professor Feinstein's event study does not seek to prove that the DMF Charge caused Prudential's stock price to drop, but that is not cause for exclusion under Rule 702.

### c. Plaintiffs' Damages Model

Defendants also attack the reliability of Professor Feinstein's damages model, arguing that Professor Feinstein merely describes a framework for calculating damages without actually applying it in this case. But as will be discussed in the context of Lead Plaintiffs' motion for class certification, class treatment would still be appropriate here even if damages were required to be calculated on an individual basis. See Neale v. Volvo Cars of N. Am., LLC, --- F.3d ----, 2015 WL 4466919, at *17 (3d Cir. July 22, 2015) (denial of class certification solely because damages require individual calculation would be abuse of discretion). The Court therefore need not consider the reliability of Professor Feinstein's damages model at this stage. Blood Reagents, 783 F.3d at 188.

### 3. Fit

Defendants also do not challenge the helpfulness of Professor Feinstein's report, so long as it is reliable. To satisfy the third requirement, expert testimony must be "relevant for the

purposes of the case" and helpful to the factfinder.  <u>Schneider</u>, 320 F.3d at 404.  Professor Feinstein's opinion helps establish that Prudential's stock traded in an efficient market.  <u>See</u> Feinstein Decl. & Report ¶ 2.  It therefore bears directly upon reliance through a detailed empirical analysis of market efficiency.  <u>See id.</u> ¶¶ 29-157.  Lead Plaintiffs have also satisfied the third requirement of fit.

In light of the foregoing, Defendants' motion to exclude Professor Feinstein's expert report is denied.  The Court now turns to Lead Plaintiffs' motion for class certification.

**B.  Lead Plaintiffs' Motion for Class Certification**

Defendants challenge adequacy and predominance.  Under adequacy, they argue that National Shopmen is insufficiently educated about the case to serve as class representative under Rule 23(a)(4).  Under predominance, Defendants advance three arguments.  Specifically, Defendants argue that (1) Plaintiffs cannot invoke the <u>Basic</u> presumption of fraud-on-the-market because they have not shown that the DMF Charge was responsible for the subsequent drop in stock price because of contemporaneous disclosures; (2) those same contemporaneous disclosures rebut the <u>Basic</u> presumption, even if it is invoked, because they raise a triable issue as to price impact; and (3) Lead Plaintiffs have failed to provide an adequate model for the calculation of damages on a class-wide basis.[5]  The Court first addresses the Rule 23(a) prerequisites before reaching the Rule 23(b)(3) predominance inquiry.

**1.  Rule 23(a) Prerequisites**

**a.  Numerosity, Commonality, and Typicality**

---

[5] Defendants also claim that Lead Plaintiffs are not entitled to the presumption in the first instance because they have failed to identify a corrective disclosure.  Their arguments under this point rely on disputable interpretations of various facts and are inappropriate to reach at this stage.

Defendants do not challenge class certification on numerosity, commonality, or typicality grounds.  The Court is satisfied that those requirements are met here.

"Numerosity requires a finding that the putative class is 'so numerous that joinder of all members is impracticable.'"  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 182 (3d Cir. 2001) (quoting Fed. R. Civ. P. 23(a)(1)).  This requirement is readily met in securities cases involving an issuer whose stock trades publicly on the NYSE.  See, e.g., In re Honeywell Int'l Inc. Sec. Litig., 211 F.R.D. 255, 260 (D.N.J. 2002).  As Prudential stock trades on the NYSE with significant daily volume, see Feinstein Report ¶ 47, it is clear that joinder would be impracticable.  The numerosity requirement is therefore easily met here.

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  Newton, 259 F.3d at 183 (internal quotations and citations omitted).  The standard for meeting this requirement is therefore not particularly demanding, see id., and the Court finds that it is easily met here.  For example, the issues of materiality and loss causation both present common questions of law and fact and can be proven with common evidence.  See Amgen 133 S. Ct. at 1198; Halliburton I, 131 S. Ct. at 2185.

The standard for demonstrating typicality under Rule 23(a)(3) is similarly undemanding and requires that "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant."  Newton, 259 F.3d at 183-84.  Additionally, "the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation."  In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 599 (3d Cir. 2009).  The factual and legal predicates of National Shopmen's (the proposed class representative) claims are the same as those for the class members.  Defendants have not

identified any unique defense to which National Shopmen is exposed.  Rule 23(a)(3)'s typicality requirement is therefore met.

### b.  Adequacy

Defendants challenge National Shopmen's adequacy as class representative, arguing that deposition testimony of its corporate representative shows that National Shopmen is inadequately informed about the details of this litigation and is therefore unfit to serve as class representative. The Court disagrees.

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class."  In assessing adequacy, the Court first examines the qualifications of proposed class counsel.  Schering Plough, 589 F.3d at 602.  Here, Defendants do not challenge proposed class counsel's qualifications.  It is clear that proposed class counsel is highly qualified to represent the class.  See Dkt. No. 133-6, Ex. D to Williams Decl.  Next, the Court determines whether the proposed class representative has "interests antagonistic to those of the class."  New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007) (internal quotations and citations omitted).  This inquiry principally focuses on whether there are "conflicts of interest between named parties and the class they seek to represent."  Schering Plough, 589 F.3d at 602 (internal quotations omitted).  Where, as here, the proposed class representative has retained adequate counsel, the class representative is not inadequate simply because it lacks "particularized knowledge concerning the dispute at issue."  Szczubelek v. Cendant Mortg. Corp., 215 F.R.D. 107, 120 (D.N.J. 2003).  Instead, a class representative may be adequate even when it possesses only minimal knowledge regarding the litigation.  New Directions, 409 F.3d at 313.

National Shopmen easily meets this standard.  To be sure, National Shopmen's corporate representative inaccurately characterized certain facts regarding this litigation during his

deposition.  But Lead Plaintiffs also point to his many accurate statements regarding the litigation during the same deposition.  The deposition testimony meets the threshold "minimal knowledge" standard set forth above.  The Court therefore rejects Defendants' contention that National Shopmen cannot adequately serve as class representative.  The adequacy requirement of Rule 23(a)(4) is satisfied.

Lead Plaintiffs have therefore satisfied the Rule 23(a) prerequisites to class certification. The Court now shifts its attention to Rule 23(b)(3)'s predominance requirement.

### 2.   Predominance Under Rule 23(b)(3)

Class certification under Rule 23(b)(3) is appropriate only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).  This requirement is considerably more demanding than Rule 23(a)'s commonality prerequisite and "imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members."  Sullivan v. DB Investments, Inc., 667 F.3d 273, 297 (3d Cir. 2011).

The Court's predominance inquiry in this case focuses on the reliance element of Lead Plaintiffs' Rule 10b-5 claim.  In particular, the Court must determine whether Lead Plaintiffs establish entitlement to the Basic presumption of reliance and, if so, whether Defendants successfully rebut that presumption by showing a lack of price impact.

### a.   Establishing the Basic Presumption: Market Efficiency

In order to establish entitlement to the <u>Basic</u> presumption, Lead Plaintiffs must prove that Prudential stock trades in an efficient market.[6]  <u>Halliburton II</u>, 134 S. Ct. at 2416.  Defendants then may rebut that presumption with evidence demonstrating a lack of price impact attributable to the alleged misrepresentations.  <u>Id.</u> at 2415.  If the Court finds the <u>Basic</u> presumption does not apply, either because market efficiency was not established or because Defendants proved there was no price impact, then individual issues of reliance would predominate over common issues in this case, "rendering class certification inappropriate."  <u>Id.</u> at 2416.

Lead Plaintiffs have proven that Prudential's stock traded in an efficient market.  For one, Prudential's stock trades on the NYSE.  <u>See</u> <u>In re DVI, Inc. Sec. Litig.</u>, 639 F.3d 623, 634 (3d Cir. 2011) (trading on the NYSE strongly supports a finding of market efficiency); <u>see also</u> <u>In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.</u>, No. 05-1151, 2013 WL 396117, at *11 (D.N.J. Jan. 30, 2013) (no further market efficiency analysis necessary where the defendant's stock traded on the NYSE and was a component of the Dow Jones Industrial Average).  Professor Feinstein's expert report also establishes that each of the widely-cited <u>Cammer</u>/<u>Krogman</u> factors weighs in favor of a finding of market efficiency.  <u>See</u> Feinstein Report ¶¶ 35-153.  Defendants do not argue to the contrary.  <u>See</u> Dkt. No. 184-1, Decl. & Report of Daniel R. Fischel ¶¶ 5-30.  The Court is therefore convinced that Prudential's stock trades in an efficient market.  Thus, the <u>Basic</u> presumption affirms that the investors relied on the alleged misrepresentations unless Defendant can prove an absence of price impact.

### b.  Loss Causation

---

[6] The three other requirements to invoke the presumption are all easily met here.  Materiality will always rise or fall by common evidence, and publicity and market timing are not in dispute.  Thus, the <u>Basic</u> presumption will be invoked if market efficiency is shown.

Defendants argue that Lead Plaintiffs are not entitled to the <u>Basic</u> presumption because Lead Plaintiffs have not proven that the DMF Charge affected the price of Prudential stock. Defendants do not dispute that Prudential's stock dropped following the DMF Charge. Instead, they argue that this drop was caused by contemporaneous disclosures and Professor Feinstein failed to isolate the price impact of the DMF Charge from the impact of other contemporaneous disclosures.

This is loss causation, and loss causation need not be proven at this stage.

> "The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory. Loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory."

<u>Halliburton I</u>, 131 S. Ct. at 2186.

Price impact and loss causation are distinct. Price impact asks "whether the alleged misrepresentations affected the market price" of the stock. <u>Halliburton I</u>, 131 S. Ct. at 2187. Loss causation, on the other hand, asks whether the subsequent decline in the price of the stock was caused by a correction of the prior misrepresentations or by other confounding factors. <u>Id.</u> at 2185 (citing <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 342 (2005)). The distinction is subtle: "whether the alleged misrepresentations affected the market price in the first place"—i.e., whether there was "price impact"—is a different inquiry than whether those same representations "also caused a subsequent economic loss." <u>Id.</u> at 2186. This is particularly important at class certification because evidence of loss causation is irrelevant at that stage, <u>see id.</u> at 2187, while evidence of price impact, or lack thereof, is highly relevant. <u>See</u> <u>Halliburton II</u>, 134 S. Ct. at 2415-16. Whether the initial misrepresentations affected the stock price is price impact. Whether the final disclosure

later caused the stock price to drop is loss causation. Defendants' argument here relies solely on the latter, and is therefore inappropriate at this stage.

Defendants' citations to authority for the contrary proposition are inapposite. In <u>Sicav v. James Jun Wang</u>, the Southern District of New York rejected class certification which was premised not on a theory of corrective disclosures, as in this case, but on a theory based in "the mechanics by which shares of stock were priced during a protracted period of open-market trading." No. 12-6682, 2015 WL 268855, at *3 (S.D.N.Y. Jan. 21, 2015). The Court noted that such claims "have almost always been held ill-suited to classwide resolution." <u>Id.</u> Specifically, "the need for a trade-by-trade inquiry into whether or not there was persistent price inflation" prevented common issues from predominating. <u>Id.</u> The case also did not deal with or cite to <u>Basic</u>. Defendants only other case decided at class certification, <u>In re Xcelera.com Securities Litigation</u>, No. 00-11649, 2008 U.S. Dist. LEXIS 77807 (D. Mass. Apr. 25, 2008), was decided before <u>Amgen</u> and <u>Halliburton</u> established that loss causation and materiality need not be proven at class certification. Defendants' remaining authority concern the plaintiffs' proof requirements at summary judgment and trial, not at class certification. <u>See Schiff</u>, 602 F.3d at 171-72, 174-76 (materiality immediately before trial); <u>Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC</u>, 752 F.3d 82, 96 (1st Cir. 2014) (loss causation at summary judgment); <u>In re Exec. Telecard Sec. Litig.</u>, 979 F. Supp. 1021, 1023-25 (S.D.N.Y. 1997) (damages at summary judgment); <u>In re Omnicom Grp., Inc. Sec. Litig.</u>, 541 F. Supp. 2d 546, 550-51 (S.D.N.Y. 2008) (loss causation at summary judgment), <u>aff'd</u>, 597 F.3d 501 (2d Cir. 2010).

Defendants do not contest that Prudential's stock price dropped significantly following the DMF Charge. The argument that the drop may have been caused by other contemporaneous

disclosures, not the DMF Charge, goes to loss causation, an issue inappropriate for consideration at class certification.

### c.  Rebutting the <u>Basic</u> Presumption: Price Impact

Defendants argue that rebutting the <u>Basic</u> presumption merely requires Defendants to introduce evidence raising a triable issue of fact as to whether there was a price impact, citing Federal Rule of Evidence 301.  The Court disagrees.

A plaintiff is not required to prove price impact in order to rely on the <u>Basic</u> presumption. <u>See</u> <u>Halliburton II</u>, 134 S. Ct. at 2414.  Instead, the plaintiff can establish entitlement to the presumption through evidence of publicity and market efficiency—"an indirect way of showing price impact." <u>Id.</u> at 2415.  Once those prerequisites are established, the defendant bears the burden to prove a lack of price impact through direct evidence.  <u>Id.</u> at 2415-16; <u>see also</u> <u>id.</u> at 2417 (Ginsburg, J., concurring) (emphasizing that "it is incumbent upon the defendant to show the absence of price impact"); <u>Aranaz v. Catalyst Pharm. Partners, Inc.</u>, 302 F.R.D. 657, 673 (S.D. Fla. 2014) (stating that the defendants' burden to prove absence of price impact is "daunting").  The Northern District of Texas considered and rejected the same argument Defendants advance here.  <u>See</u> <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, No. 02-1152, --- F.R.D. ----, 2015 WL 4522863, at *4-7 (N.D. Tex. July 25, 2015) (finding that the defendant bore the burdens of both production and persuasion to prove lack of price impact).  Merely pointing to other potential causes for a stock price change following a corrective disclosure is therefore not enough to rebut the <u>Basic</u> presumption.

Here, Professor Feinstein's event study analysis establishes positive, statistically significant price movements following five of six alleged misrepresentations. <u>See</u> Feinstein Report

¶¶ 96-122, Exhibit 7.[7]  Professor Feinstein chose those alleged misrepresentations for his event study because they were initial announcements of financial results and earnings guidance— information that is widely accepted to be important to investors.  Id. ¶¶ 96-98.  Defendants do not challenge those findings or provide any evidence that those price movements were attributable to something other than the alleged misrepresentations.  See Fischel Report ¶¶ 5-30; Dkt. No. 234-12, Rebuttal Report of Steven P. Feinstein ¶¶ 30-40.  Instead, Professor Fischel criticizes the fact that Professor Feinstein did not find statistically significant price impact following fourteen other alleged misrepresentations and did not relate the statistically significant price impacts to the alleged misrepresentations.  Fischel Report ¶¶ 17-18, Ex. 1.

But virtually all of the fourteen other alleged misrepresentations were either: (1) repeat announcements of the financial results to which Prudential's stock price did react in a statistically significant manner or (2) statements having nothing to do with Prudential's financial results.  See Fischel Report Ex. 1; Am. Compl. ¶¶ 46, 50, 59-60, 66, 69, 72-74, 78, 90.  Defendants provide no rebuttal to Professor Feinstein's justifications for choosing the dates that he did for his event study.  They also provide no reason why the absence of a statistically significant price impact following some alleged misrepresentations should be given more weight than the presence of statistically significant price impact following the five alleged misrepresentations of financial results.[8]  Lead Plaintiffs have produced evidence showing statistically significant changes in Prudential's stock

---

[7] The Report also finds a statistically significant movement following the disclosure of the DMF Charge, as discussed above.  Id.

[8] Also, it also does not necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact.  It is possible that those statements assisted in maintaining an inflated price for Prudential's stock—a possibility that Defendants do not rule out.  See, e.g., In re Bristol-Myers Squibb Sec. Litig., No. 00-1990, 2005 WL 2007004, at *17-18 (D.N.J. Aug. 17, 2005) (finding that "a misstatement could serve to maintain the stock price at an artificially inflated level without also causing the price to increase further").

price following important financial disclosures.  In the face of these, Defendants have not successfully proven lack of price impact.  The Basic presumption therefore stands unrebutted. Reliance can be proven here through common evidence.

### d.  Damages

Defendants also argue that class certification must be denied because Lead Plaintiffs have failed to demonstrate that damages are capable of measurement on a class-wide basis.  Defendants cite Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013), for the proposition that Lead Plaintiffs must affirmatively establish at class certification that damages can be calculated class-wide in order to satisfy the Rule 23(b)(3) predominance requirement.

But Comcast was an antitrust case in which there was only one viable theory of antitrust impact and the plaintiffs' damages model did not measure damages in accordance with that theory. Id. at 1433.  Based on the particular facts of that case, issues common to the proposed class would have been overwhelmed by individual damage calculations.  See id.  The Court therefore required an inquiry into the merits of the plaintiffs' damages model at the class certification stage.  See id. at 1432-35. The case did not stand for the general proposition that in all class actions, a plaintiff must prove that damages are calculable on a class-wide basis before class certification can be granted.

Class certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages.  See Neale v. Volvo Cars of N. Am., LLC, --- F.3d ----, 2015 WL 4466919, at *16-17, *17 n.10 (3d Cir. July 22, 2015) (holding that the predominance analysis in Comcast "was specific to the antitrust claim at issue" and reiterating the well-established proposition that class certification is not necessarily defeated because of individual damages calculations).  Indeed, in securities cases such as this one where all other issues are provable by

common evidence, denial of class certification solely on the basis of individual damages calculations would be "an abuse of discretion."   See id. at *17.   Because common issues predominate on all other issues of law and fact presented to the Court, the Court need not assess the validity of Plaintiff's damages model at this stage.

In light of the foregoing, the Court finds that common issues of law and fact predominate over individual issues.   Rule 23(b)(3)'s predominance requirement is satisfied.

### 3.   Superiority Under Rule 23(b)(3)

Finally, the Court is satisfied that "a class action is superior to other available methods for fairly and efficiently adjudicating" this case.   Fed. R. Civ. P. 23(b)(3).   In determining superiority, the Court should weigh the following non-exhaustive list of factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Id.; Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615-16 (1997); Garcia v. Freedom Mortg. Corp., 274 F.R.D. 513, 516 (D.N.J. 2011).   Consideration of those factors makes clear that the class action is superior to any other method of adjudicating this case.   Perhaps most importantly, the class likely consists of a significant number of investors with relatively small losses who would have decreased motivation to pursue their cases individually.   See Krangel v. Golden Rule Res., Ltd., 194 F.R.D. 501, 506 (E.D. Pa. 2000).   The remaining three factors also weigh in favor of class treatment.   The Court is not aware of any pending cases by or against class members, and concentration of the litigation here is desirable to ensure consistency in adjudication.   There is also no indication that there will be any particular difficulties in managing this case as a class action.

24

Indeed, it is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases.  See In re NYSE Specialists Sec. Litig., 260 F.R.D. 55, 80 (S.D.N.Y. 2009).  The superiority requirement is met.

**IV.**   **CONCLUSION**

In light of the foregoing, Defendants' motion to exclude Lead Plaintiffs' expert report is **DENIED** and Lead Plaintiffs' motion for class certification is **GRANTED**.  An appropriate order follows.

*/s Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**
